UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARIE WINFIELD, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:16-cv-11482-IT |
| | * | |
| LAWRENCE GENERAL HOSPITAL, | * | |
| MICHAEL FORNESI, LIEUTENANT | * | |
| GREGORY HENDERSON, SERGEANT | * | |
| ROBERT DIBENEDETTO, and | * | |
| OFFICER TIMOTHY DUBE, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

October 5, 2018

TALWANI, D.J.

Plaintiff Marie Winfield filed this civil rights action for damages arising out of an incident at Lawrence General Hospital. Winfield claims Defendant Officer Timothy Dube used excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution and the Massachusetts Civil Rights Act.[1] Dube filed a Motion for Summary Judgment [#44], arguing that he did not use any excessive force and asserting the defense of qualified immunity. Winfield filed a Cross Motion for Summary Judgment [#48]. For the following reasons, Dube's motion is ALLOWED and Winfield's motion is DENIED.

I. Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[1] The court dismissed all of Winfield's claims against Lawrence General Hospital, Michael Fornesi, and Lieutenant Gregory Henderson, as well as Winfield's other claims against Dube, see Memorandum and Order [#28], and Winfield has filed a Stipulation of Dismissal [#40] as to her claims against Sergeant Robert Dibenedetto.

Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation." Patco Constr. Co. v. People's United Bank, 684 F.3d 197, 206-07 (1st Cir. 2012) (internal quotations omitted). A court must view all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Nonetheless, a court must "disregard conclusory allegations, improbable inferences, and unsupported speculation in determining whether a genuine factual dispute exists." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (internal quotations omitted).

II. Background

On May 15, 2016, Marie Winfield was released from Holy Family Hospital after receiving treatment for sciatica. Pl.'s Stmt. of Mat'l Facts ("Pl.'s SOF") ¶ 1 [#49]. Winfield made her way to Lawrence General Hospital where she hoped to reach her doctor. Id. Winfield had been attempting to contact her doctor to determine whether she could take a new medicine she had been prescribed, but had been unsuccessful at connecting with him. Id. ¶ 2; Def.'s Ex. B (Winfield Dep.) 18:11-16 [#46-2]. The doctor had left multiple voicemail messages on Winfield's phone attempting to contact Winfield, id. at 18:15-18, and indicated that he was calling from the Lawrence General Hospital emergency room, id. at 19:1-2. Winfield did not, however, have an appointment to see him or anyone else at Lawrence General Hospital. Id. at 15:10-12.

The entry to Lawrence General Hospital contains two sets of automatic glass sliding doors. Visitors first walk through a set of exterior automatic glass sliding doors into a rectangular entryway, and then proceed through a set of interior automatic glass sliding doors into the lobby.

2

Winfield entered the lobby of Lawrence General Hospital, advanced to the receptionist's desk, and asked the receptionist for assistance locating her doctor. Pl.'s SOF ¶ 3 [#49]; Def's. Stmt. of Mat'l Facts ("Def.'s SOF") ¶ 4 [#46]. Winfield wrote her doctor's name on a piece of paper and handed this paper to the receptionist. Pl.'s SOF ¶ 3 [#49]. The receptionist made several calls to various hospital departments in an unsuccessful attempt to locate Winfield's doctor. Id. ¶ 4. Sometime thereafter, the receptionist called hospital security. Id.; Def.'s SOF ¶ 5 [#46].

Lawrence General Hospital security guard Michael Fornesi responded. Def.'s SOF ¶ 6 [#46]. Fornesi recognized Winfield because she had a lawsuit pending against Fornesi and Lawrence General Hospital. Def.'s Ex. E (Fornesi Dep.) 15:20-21 [#46-5]. After seeing Winfield, he called for backup. Id. Lawrence General Hospital security guards Greg Levesque and Fernando Collazo responded to Fornesi's call. Def.'s SOF ¶ 7 [#46].

The receptionist handed Fornesi the paper with the name of Winfield's doctor written on it. Def.'s Ex. E (Fornesi Dep.) 20:18-19 [#46-5]; Pl.'s SOF ¶ 6 [#49]. Fornesi told Winfield that her doctor was not at Lawrence General Hospital. Def.'s Ex. B (Winfield Dep.) 24:15-17, 30:4-7 [#46-2]. Winfield did not leave. Id. at 26:23. Fornesi used his radio to contact dispatch to request the assistance of the Lawrence Police Department. Def.'s SOF ¶ 11 [#46]. Fornesi said, "Dispatch, get me Lawrence Police to the main lobby. I have a visitor refusing to leave." Def.'s Ex. E (Fornesi Dep.) 23:10-11 [#46-5]. Winfield did not see or hear Fornesi make this call, and did not yet know the police had been called. Pl.'s SOF ¶ 8 [#49].

Winfield approached Levesque and asked whether security was waiting for an answer from their office as to whether Winfield's doctor was available. Id. Levesque told Winfield that the police had been called and were on their way to Lawrence General Hospital. Id. Winfield

3

asked why the police were called, but Levesque did not answer. Id. Winfield then approached Collazo and asked why the police had been called. Id. Collazo also did not answer. Id.

When Lawrence Police Officers Timothy Dube and Preston Carmichael arrived, Fornesi briefed them outside the hospital. Def.'s Ex. I (Carmichael Aff.) ¶ 10 [#46-9]. Fornesi asked the officers to assist in escorting Winfield out of the hospital. Id. ¶ 6. He told the officers that Winfield was looking for a doctor who was not working and was therefore unavailable, that this information had been relayed to Winfield, that Winfield had been asked to leave, that Winfield was creating a disturbance at the service desk, and that Winfield was not in need of any medical services. Id. ¶¶ 7-9; see also Def.'s Ex. E (Fornesi Dep.) 26:25-27:2 [#46-5]. Fornesi told them Winfield had "refused to leave." Id. Fornesi said that he had had prior dealings with Winfield, who was suing him. Id. ¶ 7; Def.'s Ex. L (Police Incident Report) 1 [#46-12]. Winfield did not overhear this discussion, and "has no first-hand knowledge of what Fornesi told the police officers outside." Pl.'s Resps. to Def.'s SOF (hereinafter "Pl.'s SOF Resps.") ¶ 14 [#50].

After Fornesi briefed the officers, Fornesi, Dube, and Carmichael entered the hospital lobby. Def.'s SOF ¶ 15; Def.'s Ex. B (Winfield Dep.) 31:5-11 [#46-2]. Dube asked Winfield to leave Lawrence General Hospital. Def.'s Ex. F (Levesque Dep.) 23:22-25, 24:5-9 [#46-6]; Def.'s Ex. H ¶ 14 [#46-8]; Def.'s Ex. I (Carmichael Aff.) ¶ 12 [#46-9]. Dube and Winfield engaged in a conversation for several minutes. Winfield showed Dube the paper containing her doctor's name, and explained that she was at the hospital to see her doctor. Pl.'s SOF ¶ 9 [#49].

Dube directed Carmichael to pick up Winfield's purse and take it outside. Def.'s SOF ¶ 18 [#46]; Def.'s Ex. F (Levesque Dep.) 24:9-11 [#46-6]. Carmichael picked up Winfield's purse and exited through the interior automatic sliding glass doors into the hospital entryway.

4

Def.'s SOF ¶ 19 [#46]. When in the hospital entryway, Carmichael turned around and remained a few feet from the the exterior side of the interior automatic sliding glass doors. Pl.'s SOF ¶ 10.

The parties dispute what happened next, but both have submitted what appears to be video footage of the events involving Winfield occurring at Lawrence General Hospital on May 15, 2016. This video footage comes from two different camera angles. The "Entryway Video" appears to show the interior automatic sliding glass doors that form the entrance to the hospital lobby. The "Interior Video" shows a portion of the area inside the hospital, including the internal side of the interior automatic sliding glass doors, and in the distance, the receptionist's desk.[2] Although Winfield contends that there are unexplained gaps in the Interior Video footage, she nonetheless relies on the two videos.[3] The Entryway Video shows the force used by the officers

---

[2] Dube submitted both the Interior Video and the Entryway Video on a single CD without any affidavit authenticating the videos. Def.'s Ex. K [#46-11]. Winfield submitted the same two videos as evidence in support of her Cross-Motion for Summary Judgment. See Pl.'s Ex. K [#51-10]. Winfield also submitted two other CDs containing video evidence. See Pl.'s Ex. F (Interior Video with Timecode) [#51-5]; Pl.'s Ex. I (Side-by-Side Comparison of Interior and Entryway Videos) [#51-8]. Winfield does not claim that her video evidence *differs* from Dube's video evidence. Instead, she has submitted her Exhibit F, the Interior Video with a timecode added, and her Exhibit I, labeled a side-by-side comparison of the Interior and Entryway Videos, to show that there are points where the video footage skips. While the court has reviewed Winfield's Exhibit F, Winfield's Exhibit I is a CD that contains only a "shortcut" to a video located on Winfield's personal computer, and does not itself contain any video that can be viewed from the CD.

[3] Winfield has submitted an affidavit from her daughter, Jana Winfield, who has a degree in film and cinematography and has worked as a video creator and editor since 2015. Pl.'s Ex. E (Jana Winfield Aff.) ¶¶ 3-4 [#51-4]. Jana Winfield states that, based on her review of the video footage, the Entryway Video is motion-activated, and thus did not record times when "there was no movement in the area." Id. App'x A ¶ 4. Further, Jana Winfield states that the Interior Video has "moments of footage missing," that there is "no explanation for why this footage is missing," and that "the amount of missing footage starts to increase at the end when the guards are grabbing and shoving [Marie Winfield]." Id. App'x A ¶ 5. For these reasons, other than to the extent *Winfield* relies on the video footage to support her claims, the court does not rely on the Interior Video for this background section, but instead relies on the Entryway Video. While Winfield also states that "[t]he assault is more dramatically visible" on the Interior Video, see Pl.'s SOF ¶ 13 [#49], the court has reviewed the Interior Video and does not see any corroboration of Winfield's characterization of what occurred.

during what Winfield describes as "[t]he beginning of the Defendant's assault on the Plaintiff." Pl.'s SOF ¶ 13 [#49].[4]

Winfield walked toward the interior automatic sliding glass doors, causing the doors to open. Entryway Video 5:54:32 PM [#46-11]. Carmichael waved his hand to signal to Winfield to walk faster. Pl.'s SOF ¶ 10 [#49]. Winfield stopped and stood a few feet on the interior side of the interior automatic sliding glass doors, waving the piece of paper with her doctor's name on it. Entryway Video 5:54:47 PM [#46-11]. The doors closed again. Id. Winfield asserts that she stopped because Dube began pushing her before she reached the automatic sliding glass door. Pl.'s Resps. to Def.'s SOF ¶ 20 [#50]. However, the Entryway Video shows that both of Winfield's arms were still free at this time. Entryway Video 5:54:32-5:54:47 PM [#46-11]. A male visitor entered the entryway and walked up to the interior automatic glass sliding doors. Id. at 5:54:41 PM. Upon seeing Winfield standing just inside the interior automatic glass sliding doors, however, that visitor stepped to the side. Id. at 5:54:47 PM. Winfield took two steps from her position in the lobby toward the entryway leading to the outside. Id. at 5:54:48 PM. She then pulled backward from the door slightly, where she stood with her front leg extended and her rear leg bent, leaving her leaning somewhat toward the interior of the lobby. Id.

Winfield stood perpendicular to the threshold of the interior automatic sliding glass door, with her right arm extended so that the paper with her doctor's name on it was almost at her chin

---

Winfield repeatedly cites to the video evidence throughout her Cross-Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment [#48], Statement of Genuine Issues of Material Facts [#49], and Response and Opposition to Defendant's Statement of Fats [#50] in support of her claims for excessive force. At the hearing on the motions for summary judgment, Winfield asked the court to consider the video evidence, which she believes demonstrates a use of excessive force.

[4] Winfield states that the force used is only "barely" visible on the Entryway Video, "because the file[] was compressed and zipped," id., but the video is clearly visible on Dube's Exhibit K, which shows Dube moving Winfield from inside to outside the hospital.

level, and looking slightly toward the inside of the hospital. Id. at 5:54:49 PM. Dube extended his left arm so that it was just behind Winfield's back, and used his right hand to grip Winfield's upper right arm. Id. When he did so, Winfield moved both arms upward and turned her body away from Dube. Id. Dube pulled Winfield's right arm down. Id. Continuing to grip Winfield's right arm, Dube moved Winfield through the open interior automatic sliding glass doors, causing Winfield to stumble slightly as she stood with one foot still inside the hospital and her other foot on the threshold of the interior automatic sliding glass door. Id. at 5:54:49-5:54:51 PM; Def.'s SOF ¶ 31 [#46]. Dube then used both hands to grab Winfield's upper right arm. Id. at 5:54:50 PM. He then again used his left arm to guide Winfield's back while moving her forward. As Winfield took a step over the threshold of the interior automatic glass sliding doors into the entryway, Dube released his left arm from Winfield's back, and used his right hand, which was still gripping Winfield's upper right arm, to move Winfield through the interior automatic sliding glass doors and into the entryway. Id. at 5:54:50-5:54:51 PM.

In the entryway, Winfield regained her balance and bent her knees, such that she was standing in a hunched position, with Dube still using his right hand to grip her upper right arm. Id. at 5:54:51 PM. Dube then again used both of his hands to hold Winfield's upper right arm. Id. at 5:54:53 PM. The Entryway Video shows that, as Dube used both hands to strengthen his grip, Dube and Winfield were saying something to one another. Id. With Dube still gripping Winfield's upper right arm, Dube and Winfield exited off the Entryway Video camera view, where they proceeded through the exterior automatic sliding glass doors to the outside. Id. at 5:54:53-5:54:56 PM.[5] Once Dube, Winfield, and the other officers on the scene exited through

---

[5] Winfield describes these events as follows: "Dube proceeded to jerk, push, and spin the Plaintiff around like a rag doll at the door and into the vestibule." Pl.'s SOF ¶ 13 [#49]. Winfield states that this conduct is visible on both the Interior and Entryway Videos. Id. The court has reviewed the videos and finds that no reasonable jury could credit Winfield's version.

7

the interior automatic glass sliding doors, the male hospital visitor who stopped in the entryway when he saw Winfield proceeded through the doors into the lobby. Id.

Winfield asserts that at this point, she lost consciousness, and she has no memory of what happened next. Def.'s Ex. B (Winfield Dep.) 40:23-24, 41:1-5 [#46-2]; Pl.'s SOF ¶¶ 16-17 [#49]. Once outside the hospital, Dube released his hold on Winfield's arm. Def.'s SOF ¶ 22 [#46]. Shortly thereafter, Winfield ended up on the sidewalk outside the hospital in a seated position. Def.'s Ex. E (Fornesi Dep.) 31:3-4, 33:16-17 [#46-5]; Def.'s Ex. F (Levesque Dep.) 28:10-25 [#46-6]; Def.'s Ex. L (Police Incident Report) 2 [#46-12]; Def.'s Ex. M 1 [#46-13].

Winfield's husband, Robert Winfield,[6] who had been waiting for his wife outside the hospital in his vehicle, saw three police cars approach the main entrance of the hospital and exited his vehicle to see what was happening. Pl.'s Ex. G (Robert Winfield Aff.) ¶¶ 4-5 [#51-6]. Robert Winfield saw his wife sitting on the sidewalk surrounded by security guards and police officers. Id. ¶ 6. Winfield was not moving or speaking, and did not appear to see Robert Winfield. Id. ¶ 7. As Robert Winfield approached the group, he heard someone ask her whether she had someone who could take her home. Id. Robert Winfield said that he was Marie Winfield's husband. Id. Lawrence Police Sergeant Dibenedetto arrived at the scene and told Robert Winfield to drive his vehicle to where the group was gathered. Id. ¶ 8; Def.'s Ex. J (Dibenedetto Aff.) ¶ 5 [#46-10]. Robert Winfield returned to his vehicle and drove to within a few feet of where Winfield was sitting. Pl.'s Ex. G (Robert Winfield Aff.) ¶ 9.

As Robert Winfield describes what happened next, "[t]wo policemen held Marie and brought her to the vehicle. They opened the car door and pushed and shoved her into the passenger seat. At that time, Marie was still not talking or saying anything, and did not appear to

---

[6] To avoid any confusion between the multiple Winfields referred to in this order, the order refers to Robert Winfield by his first and last names.

8

be aware of what was going on." Pl.'s Ex. G (Robert Winfield Aff.) ¶ 10. Winfield attempted to free her arms from the officers' grasp, and her arm struck Carmichael's face. Def.'s SOF ¶ 28. Throughout this period of time, Winfield was continuing to resist the officers' efforts to get her into the vehicle. Id. ¶ 30. As Winfield describes the situation, "in a fog [she] perceived [Dube and Carmichael] as some common criminals just attacking her." Pl.'s SOF ¶ 18 [#49].

Winfield states that Dube closed the vehicle door on her foot, which jolted her back to a semi-conscious state. Pl.'s SOF ¶ 18 [#49]. Robert Winfield states that after the officers pushed Marie Winfield into the vehicle's passenger seat, they "started pushing the car door shut, and Marie appeared to wake up from some kind of sleep, and said, 'Stop! You're hurting my foot.'" Pl.'s Ex. G (Robert Winfield Aff.) ¶ 12 [#51-6]. Robert Winfield further states that he saw Marie Winfield's "right leg was leaning out the door and her foot was caught between the doors and wedged at the bottom of the door. [The police officers] were trying to shut the door while her body was not fully in the car." Id. ¶ 13. Then, "Marie waived her arms trying to keep [sic] the car door back open, almost in a disorganized fashion, as if she did not have full control over her body." Id. ¶ 14. According to Robert Winfield, "it was clear that she was trying to free her foot." Id. "Marie then said again, 'Stop! You're hurting my foot.' And I saw her lean on the door, which then open[ed] a little more, and she succeeded in freeing her foot." Id. ¶ 15. The officers closed the vehicle door, and Robert Winfield drove away with Marie Winfield inside. Id. ¶ 16.

Winfield has testified that she experienced excruciating pain in her foot for several days following the incident. Pl.'s Ex. H (Winfield Dep.) 81:6-7 [#51-7]. Robert Winfield has written that Marie Winfield "could not walk around the house for several days," and that "the pain in her foot and toes" has been long-lasting. Pl.'s Ex. G (Robert Winfield Aff.) ¶ 12.

III. Analysis

Winfield's sole remaining claim against Dube is her claim of excessive force in Count One of the Complaint [#1]. Because she brings this claim under both the Fourth and Fourteenth Amendments of the United States Constitution and the Massachusetts Civil Rights Act, however, the court analyzes the claim first as a federal claim and then as a state claim.

>    a. 42 U.S.C. § 1983 Excessive Force Claim

Federal constitutional "claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989). "To make out a Fourth Amendment excessive force claim, a plaintiff must show, as an initial matter, that there was a seizure within the meaning of the Fourth Amendment, and then that the seizure was unreasonable." Stamps v. Town of Framingham, 813 F.3d 27, 35 (1st Cir. 2016). In addition to showing that Dube's conduct violated her right to be free from excessive force, Winfield must show that the right on which she bases her § 1983 claim "was 'clearly established' at the time of the defendant's alleged violation" in order to overcome Dube's assertion of the defense of qualified immunity. Id. at 34.

A person has been "seized" under the Fourth Amendment "only when there is a governmental termination of freedom of movement *through means intentionally applied*." Brower v. County of Inyo, 489 U.S. 593, 597 (1989). It is undisputed that Dube intentionally used force in grabbing Winfield's arm to remove her from Lawrence General Hospital, and later grabbing Winfield's arm to lift her off the ground and place her inside of her husband's vehicle. Further, viewing the evidence in the light most favorable to Winfield, Dube and Carmichael forced Winfield into the vehicle and closed the vehicle door on her foot. All of these applications

10

of force were seizures within the meaning of the Fourth Amendment. See California v. Hodari D., 499 U.S. 621, 626 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement.").

Winfield must next demonstrate that Dube's "actions were not objectively reasonable, viewed in light of the facts and circumstances confronting him and without regard to his underlying intent or motivation." Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 352 (1st Cir. 1995) (citations omitted). "Though the reasonableness test under the Fourth Amendment is not capable of precise definition or mechanical application, not every push or shove will reach the level required for an actionable excessive force claim." Id. (internal citations and quotations omitted). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (citations and quotations omitted).

The reasonableness of a particular use of force may depend on such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." Id. These factors speak to the governmental interests at stake. In assessing the factors, the court must look only to those facts that were available to Dube at the time he used the force at issue. Id. ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

The information that such an officer would have concerning what happened *prior* to his arrival in the lobby at Lawrence General Hospital came from what he learned from the police dispatcher and from what Fornesi told the officer when he arrived. This information included

that Winfield had been asked to leave by hospital staff, was refusing to leave, was not in need of medical services, and was creating a disturbance in the hospital lobby. Fornesi asked the officer to assist in escorting Winfield out of Lawrence General Hospital. In light of these circumstances, a reasonable officer on the scene had probable cause to believe Winfield was engaged in a crime. Under Massachusetts law, criminal trespass occurs when a person "without right enters or remains in . . . [a private building] . . . after having been forbidden so to do by the person who has lawful control of said premises." M.G.L. ch. 266, § 120. A person in lawful control of property may "summarily revoke a licensee's right to enter the premises." Afrasiabi v. Harvard Univ., 39 F. App'x 620, 623 (1st Cir. 2002). Further, while there is no video evidence that Winfield posed an immediate threat to the officers or anyone else, Fornesi told Dube that Winfield was causing a disturbance.[7] Finally, although Dube did not arrest Winfield for trespassing, Dube could have chosen to arrest Winfield based on the facts that were available to him at the time. See Alexis, 67 F.3d at 351 (applying Graham factors).[8] Accordingly, to the extent Winfield resisted Dube's efforts to move her from the hospital, this resistance was equivalent to a suspect resisting or attempting to evade arrest.

These governmental interests must be weighed against the nature of the intrusion on Winfield's Fourth Amendment interests. Winfield relies on intrusions occurring during the following three distinct stages of the incident: (1) Dube's conduct in grabbing Winfield and moving her from the hospital lobby to the outside; (2) Dube's conduct in moving Winfield

---

[7] Neither the Interior Video nor the Entryway Video includes sound. However, Dube does not need to show an actual disturbance to prove that his use of force was reasonable. He only needs to show that he was told of a disturbance, which he has done here.

[8] Winfield argues that the third Graham factor weighs in her favor because she was not arrested. To hold that officers are only reasonable in using force if they actually arrest an individual would create quite perverse incentives for police officers. That Dube could have arrested Winfield but chose instead to move her from the hospital and place her in the safe custody of her family member counsels in favor of, rather than against, the reasonableness of his conduct.

12

outside the hospital and to the vehicle Robert Winfield was driving; and (3) Dube's conduct in moving Winfield into the vehicle and closing the door on Winfield's foot. Each intrusion must be assessed in light of what a reasonable juror could find based on the evidence in the record.

Video surveillance footage captures in part the first relevant time period. After Dube entered the hospital lobby and first communicated with Winfield, Winfield and Dube engaged in a back-and-forth for several minutes. Winfield walked toward the hospital exit with officers accompanying her, but paused in front of the door to the hospital and would not appear to leave on her own accord. Video footage further confirms that Winfield was beginning to block traffic in and out of the hospital entrance. Faced with these circumstances, Dube acted reasonably in concluding that some degree of physical force was necessary to remove Winfield from the hospital. His use of force appears to have been the amount necessary to achieve that aim. When Winfield stopped at the door, Dube tightly gripped Winfield's upper right arm and moved her forward. Although this caused her to lose her balance and to stumble at the threshold of the door, she remained upright the entire time. No reasonable jury could find that this force outweighed the governmental interests at stake.

The second period of time began when Winfield lost consciousness,[9] which she states started just about the time Dube grabbed her arm and brought her outside the hospital, and ended just before the officers placed Winfield in the vehicle. There is no video footage of this period. Because Winfield has no memory of what occurred, the primary evidence about what happened during this period of time comes from the officers' accounts and from Robert Winfield to the extent he witnessed what occurred. Even where "virtually all relevant evidence derives exclusively from the officers at the scene, summary judgment nonetheless must be granted

---

[9] Although Winfield describes her condition during this time as a loss of consciousness, at the hearing on the motion for summary judgment, she agreed with the court that her condition might more accurately be described as a "blacking out" or loss of awareness of her surroundings.

13

absent a genuine dispute as to a material issue." Hegarty v. Somerset Cty., 53 F.3d 1367, 1376 n.6 (1st Cir. 1995) (internal citation omitted). As described *supra*, Dube led Winfield outside; Winfield attempted to free her arm; Dube released Winfield's arm; Winfield slumped to the ground; and Dube asked Winfield whether there was anyone who could take her home. When Robert Winfield arrived, Marie Winfield was silent, so Robert Winfield identified Marie Winfield as his wife. An officer asked Robert Winfield to pull his vehicle up close so that he could take his wife away. Once Robert Winfield pulled his vehicle closer, Dube and Carmichael lifted Winfield to her feet and brought her toward the vehicle. Winfield attempted to break free. Dube and Carmichael "shoved" Winfield into the car, according to Robert Winfield. Dube's use of force in lifting Winfield, moving her toward the vehicle, and pushing her into the vehicle was not unreasonable. In light of Winfield's lack of awareness about her surroundings and either inability or unwillingness to leave the hospital on her own, the officers acted reasonably in concluding that Winfield should not simply be left on the ground outside of the hospital, but instead should be placed in the care of a family member who could take her home. Thus, no reasonable jury could find that this intrusion on Winfield's Fourth Amendment interests outweighed the governmental interests at stake. See Graham, 490 U.S. at 396.

The third and final relevant period of time covers what happened once Winfield was placed in her husband's vehicle. A jury could infer from Robert Winfield's testimony that while Winfield's foot was wedged in the bottom of the passenger door, the officers continued to try to shut the door. At this point, Winfield states that she regained consciousness and Robert Winfield states that she yelled "Stop! You're hurting my foot."

There is no evidence in the record that the officers' act of closing the door on Winfield's foot was intentional, but this alone does not end the court's inquiry. Unintentional conduct may

constitute excessive force under the Fourth Amendment, "[w]here an officer creates conditions that are highly likely to cause harm and unnecessarily so, and the risk so created actually, but accidentally, causes harm." Stamps, 813 F.3d at 35. This rule exists to prevent "the perverse effect of immunizing risky behavior only when the foreseeable harm of that behavior comes to pass." Id. at 35. There is no evidence, however that Dube's conduct was highly likely to result in injury to Winfield or that the conduct was unnecessary. Instead, the undisputed evidence shows the necessity of the officers' conduct in removing Winfield from the hospital and putting her in the vehicle so that Robert Winfield could drive her away from the hospital.

For these reasons, the facts viewed in a light most favorable to Winfield do not create a triable issue as to whether Dube violated Winfield's Fourth Amendment right to be free from excessive force. Instead, the facts show that the force Dube used was minimal, and justified in light of the circumstances that confronted him. Thus, Dube is entitled to summary judgment on the claim. Dube is also entitled to qualified immunity based on the first prong of the qualified immunity analysis, which is "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." Stamps, 813 F.3d at 34 (internal quotations omitted). As such, the court need not reach the second step of that analysis, regarding "whether the right was 'clearly established' at the time of the defendant's alleged violation." Id.

### b. Massachusetts Civil Rights Act Excessive Force Claim

Winfield claims that the force Dube used violated her rights under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws 12, § 11I. To prevail on this claim, Winfield "must prove that (1) [her] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats,

intimidation, or coercion." Davis v. Rennie, 264 F.3d 86, 111 (1st Cir. 2001) (internal quotations omitted). The Legislature "explicitly limited the [MCRA] remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion." Bally v. Northeastern Univ., 532 N.E.2d 49, 52 (Mass. 1989). "[I]n cases involving wrongful arrests or excessive force, the fact of a Fourth Amendment violation, standing alone, does not give rise to a claim under the MCRA." Ciolino v. Eastman, 128 F. Supp. 3d 366, 380 (D. Mass. 2015). Thus, even were Winfield able to show a Fourth Amendment violation, she also would need to show that Dube's use of force was accompanied by a secondary motive or arose from an "intent to achieve 'some further purpose' of violating one or more of Plaintiff['s] rights, beyond [the] Fourth Amendment right to be free from unlawful searches or seizures." Id. at 381; see also Swanset Dev't Corp. v. City of Taunton, 668 N.E.2d 333, 338 (Mass. 1996).

For the reasons set forth *supra*, Winfield has not shown that Dube's use of force was unconstitutionally excessive. Even if she could show it was excessive, she has not produced any evidence showing that such force was accompanied by "threats, intimidation or coercion." Bally, 532 N.E.2d at 52. Nor is there any evidence in the record that would support an inference that Dube's conduct was accompanied by a secondary motive or arose from an intent to achieve some further purpose by violating Winfield's rights. Accordingly, Dube is also entitled to summary judgment on Count One insofar as it alleges a claim under the MCRA.

IV. Conclusion

For the foregoing reasons, Dube's Motion for Summary Judgment [#44] is ALLOWED and Winfield's Cross-Motion for Summary Judgment [#48] is DENIED.

IT IS SO ORDERED.

October 5, 2018 /s/ Indira Talwani
United States District Judge